USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  June 20, 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                          :
RICHARD JACKSON,                          :
                                          :
                          Plaintiff,      :          12 Civ. 1338 (KPF)
                                          :
            v.                            :          OPINION AND ORDER
                                          :
DR. EVAN BEDERMAN, *et al.*,              :
                                          :
                          Defendants.     :
                                          :
------------------------------------------------------X

KATHERINE POLK FAILLA, District Judge:

Plaintiff Richard Jackson, proceeding *pro se*, brought this action alleging

that Defendants, officers and medical professionals at Rikers Island

Correctional Facility, were deliberately indifferent to his serious medical needs

by failing to provide him with adequate mental health care.  Pending before the

Court is Defendants' motion for summary judgment as to Plaintiff's claims.  For

the reasons that follow, Defendants' motion is granted in full.

**BACKGROUND**[1]

**A.    Factual Background**

Plaintiff was incarcerated at Rikers Island, as relevant here, beginning in

December 2011.  (Medical Record 143).  He self-reported to the examining

---

[1]    The facts are drawn from Plaintiff's medical record from his incarceration at Rikers
       Island (the "Medical Record"), the Complaint ("Compl."), the Amended Complaint ("Am.
       Compl."), and Plaintiff's deposition (the transcript of which is referred to as "Jackson
       Dep.").

       For convenience, Plaintiff's opposition brief to Defendants' motion for summary
       judgment is referred to as "Pl. Opp."  The affidavit submitted by Defendants' expert
       witness, Mark Goldblatt, M.D., is referred to as the "Goldblatt Aff."

medical staff there a history of mild intermittent asthma, bipolar disorder, and heroin and cocaine use; he was at the time in a methadone treatment program. (*Id.* at 143-54).  He also reported one prior attempt at suicide via overdose.  (*Id.* at 146).  His medical intake examiner diagnosed Plaintiff with schizophrenia and prescribed methadone, in keeping with Plaintiff's then-current participation in a methadone program.  (*Id.* at 134).  Plaintiff had a subsequent appointment with a mental health clinician four days later, who scheduled a follow-up appointment with a clinician and a psychiatrist.  (*Id.* at 124-27).  Plaintiff was evaluated by a psychiatrist another five days later, who prescribed psychiatric medications.  (*Id.* at 106-09).

Over the following weeks, Plaintiff was seen by medical professionals a number of times.  (Jackson Dep. 41:9-15; Medical Record 84-88, 91-92, 110-16).  For almost this entire initial period, Plaintiff was housed in a dormitory-style housing block in the Anna M. Kross Center on Rikers Island ("AMKC").  (Jackson Dep. 34:18-35:3).  On January 3, 2012, Plaintiff was transferred within AMKC from "the dorms" (*id.* at 35:2) to what he alleges was a much less advantageous individual cell with a broken window, no blanket, and a broken light (*id.* at 48:24-49:2).  After an extremely unpleasant night, Plaintiff went to a parole hearing the next morning; thereafter, he informed a corrections officer that he was suicidal, refused to return to the substandard cell, and requested to see a psychologist.  (*Id.* at 53:12-17).  He was seen by a clinician that evening (*id.* at 57:22-25), who referred him to her supervisor for disposition (Medical Record 11-16).  That supervisor, Defendant Poggioli, reported that

Plaintiff was expressing "suicidality with plan," but that Plaintiff appeared "very goal directed to leave his current housing area." (*Id.* at 16). Plaintiff was consequently transferred to suicide watch within "C-71," the mental health observation unit within AMKC. (*Id.*; Jackson Dep. 59:16-23). A nurse practitioner evaluated Plaintiff upon his transfer to C-71 and recorded that Plaintiff informed her that — contrary to his avowals to corrections officers and Poggioli — he was not suicidal and had heard no voices ordering him to kill himself, but merely did not want to return to his cell. (Medical Record 73-74).

While in C-71, Plaintiff was enrolled in what he termed a "long-term psychological drug program" (Jackson Dep. 61:16), involving group therapy, regular individual counseling, and psychological observation (*id.* at 61:24-64:21). Plaintiff was evaluated five days later, on January 10, 2012, and remained assigned to the C-71 facility. (Medical Record 68). Plaintiff had a follow-up evaluation the next day (*id.* at 65-66) and again two days later (*id.* at 60-63); during both of these interviews, the medical professionals who examined Plaintiff reported that he was responding positively to therapy and showed no symptoms of suicidal ideation. Four days later, on January 17, 2012, another mental health professional evaluated Plaintiff, concluded that he could be "treated at a lower level of care," and recommended his transfer back to general population housing. (*Id.* at 63).

Plaintiff explained at his deposition that on the day he was transferred out of the C-71 facility, he had received a phone call informing him that a woman with whom he "used to have a relationship" had recently received an

3

upsetting medical diagnosis.  (Jackson Dep. 68:2-69:5).  He sought to speak to a therapist regarding his distress at this news, but was immediately informed that he had been transferred out of the C-71 facility.  (*Id.* at 62:13-23, 68:2-9).  Plaintiff was upset by his transfer, especially because he had believed that his enrollment in the "long term" program in C-71 meant he would be assigned to that facility for "at least about three, four months, because [he] heard it was a six-month program."  (*Id.* at 62:10-12).  As Plaintiff had only been resident in C-71 for 13 days, this transfer upset his expectations and caused him significant distress.  (*Id.*).

Plaintiff was transferred from AMKC to the mental observation dormitory in the Otis Bantum Correctional Center ("OBCC"), another facility on Rikers Island, on the evening of January 17, 2012.  (Jackson Dep. 71:20-72:21).  He requested to see a psychiatrist and was informed that he would have to wait until the morning because the facility lacked overnight psychiatric care.  (*Id.* at 72:5-73:1).  In a last-ditch effort to receive an appointment with a psychiatrist, Plaintiff informed the OBCC staff that the bad news he had received earlier in the day "concerned a death … in the family" (*id.* at 73:4-7), and, indeed, that his sister had died (*id.* at 92:19-25) — though that was, as Plaintiff testified at his deposition, a lie (*id.* at 68:2-69:5, 92:3-92:18).[2]  The staff continued to inform Plaintiff that he would not be able to see a mental health professional until the following day.  (*Id.* at 72:23-73:1).

---

[2]      Plaintiff repeated this fabrication in the Amended Complaint in this action.  (Am. Compl. 6).

The immediately subsequent series of events is not clear.  Plaintiff testified at his deposition that he "stayed up all night ... [a]nd the next morning, tried to hang [him]self."  (Jackson Dep. 73:10-12).  On Plaintiff's account, his suicide attempt was interrupted by "some guy" in the dormitory; he was then taken for a medical examination, and thereafter to see a psychologist.  (*Id.* at 73:19-25).  Plaintiff further alleges he made a second suicide attempt during his medical examination, in which he "tried to tie the wire of the fan around [his] neck."  (*Id.* at 74:3-4).[3]

The Medical Record reflects a different sequence of events.  The relevant medical documents reflect that Plaintiff was seen in his dormitory before his attempted suicide episode by a clinician, to whom he repeated the falsehood that his sister had passed away and demanded that he be transferred to suicide watch in C-71.  (Medical Record 54).  He refused, however, to speak to social services personnel or discuss his allegedly deceased sibling.  (*Id.*).  The clinician recorded her clinical judgment that Plaintiff was demonstrating goal-directed behavior animated by his desire to return to his former housing in C-71.  (*Id.* at 55).  The Medical Record goes on to indicate that Plaintiff attempted to commit suicide only after his session with the clinician on the morning of January 18.  (*Id.* at 54).

The parties' accounts largely cohere regarding this suicide attempt, though the Medical Record includes additional details Plaintiff did not discuss.

---

[3]     The Court will refer to this sequence of events, as Plaintiff recounted it, as Plaintiff's "attempted suicide episode."

Plaintiff testified that he tied a sheet around his neck, tied it to a door, and stood on a chair in an effort to hang himself. (Jackson Dep. 73:14-18). The Medical Record indicates that after Plaintiff left his counseling session with the clinician, he "took a thin piece of sheet[,] came outside of [the clinician's] door[,] and tied the string around his neck"; the Medical Record also reflects that an observer was able almost immediately to interrupt the attempt. (Medical Record 54). Non-psychological medical personnel also recorded their response to an emergency alert in the OBCC mental observation unit, where they found and examined Plaintiff immediately post-attempt. (*Id.* at 52-53).

Plaintiff offers contradictory accounts of the following events. In his deposition he acknowledged that after his attempted suicide episode — irrespective of when that episode took place — he was taken to a medical facility within OBCC, where he spoke with Defendant Bederman. (Jackson Dep. 77:18-78:1). This coheres with the Medical Record, which indicates that Bederman interviewed Plaintiff after the episode. (Medical Record 49-50). Bederman recorded that, when Bederman entered the treatment room, Plaintiff asked if Bederman were Jesus; whenever Bederman suggested that Plaintiff might remain in OBCC instead of transferring back to C-71, Plaintiff shouted, "The voices!" (*Id.* at 49). Bederman also recorded that Plaintiff repeated the falsehood regarding the recent death of his sister, as well as Plaintiff's insistence that all of his symptoms would dissipate if he were returned to C-71. (*Id.*). Bederman recorded his clinical conclusion that Plaintiff was demonstrating goal-directed behavior animated by his desire to return to his

6

former housing in C-71, and might in the future "engage in gesturing or verbalizing a desire to harm himself if not returned to C-71." (*Id.* at 50). An additional evaluation filed by Bederman 10 minutes later indicates that Plaintiff told Bederman that he would not harm himself if returned to C-71, but threatened danger to himself if he remained housed in OBCC. (*Id.* at 47-48).

Bederman's additional evaluation from January 18, the day of Plaintiff's attempted suicide episode, reflects that Defendant Poggioli also saw and evaluated Plaintiff that evening. (Medical Record 45-46). Plaintiff's deposition testimony reflects the same sequence of events: Plaintiff testified that the evening after he tried to hang himself, Poggioli appeared at OBCC to evaluate him. (Jackson Dep. 76:4-10). Poggioli's notes in the Medical Record indicate that Plaintiff expressed a desire to return to C-71 in AMKC, as well as a desire to reconnect with a nephew who was also incarcerated in AMKC. (Medical Record 45-46). Poggioli recorded that he informed Plaintiff that he (Poggioli) would make an effort to have Plaintiff reassigned to AMKC and placed in his prior program in C-71, but that Plaintiff would have to remain in OBCC's mental observation unit pending such a transfer. (*Id.*). The Medical Record and Plaintiff's deposition testimony tally on this point as well. Plaintiff testified that Poggioli promised to make an effort to have Plaintiff sent back into the program at AMKC, but that Plaintiff would have to remain at OBCC and wait for the transfer to be effected. (Jackson Dep. 76:12-77:4).

According to the Medical Record, Bederman interviewed Plaintiff again on January 19, 2012, the day after Plaintiff's attempted suicide episode. (Medical

7

Record 41).  Plaintiff acknowledged at his deposition that he saw Bederman on a second occasion after the day of his episode, though he did not testify as to when that second interview occurred.  (Jackson Dep. 90:21-91:11).  Plaintiff recalled telling Bederman during this second interview that Poggioli had held out the possibility of a transfer back to AMKC.  (*Id.* at 91:3-15).  Plaintiff also acknowledged at his deposition that he recalled reporting to someone, though he could not recall to whom, that he had overheard other inmates in the mental health observation unit expressing irritation and anger at him for attracting the attention of corrections officers to the dormitory on account of his attempted suicide episode.  (*Id.* at 78:6-79:2).

Bederman's notes of this second interview indicate that, contrary to Plaintiff's presentation during their first meeting, Plaintiff showed no signs of psychosis.  (Medical Record 41).  More troublingly, Bederman also recorded that Plaintiff admitted to feigning symptoms the previous day in an effort to return to his prior treatment program in AMKC.  (*Id.*).  Bederman concluded that Plaintiff appeared eligible for transfer to general population housing based on the absence of signs of mental disturbance, his confession of feigning symptoms the previous day, and his confession of staging his attempted suicide episode as an effort to obtain a different housing assignment.  (*Id.*).

Bederman's notes also contain a report from Plaintiff that the inmates in the mental health observation unit in OBCC had threatened Plaintiff after his attempted suicide episode.  (Medical Record 41 ("When I went back to [the mental health observation unit] they said they were going to jump me for

8

bringing heat to the house for that hang up yesterday.'"); *compare* Jackson
Dep. 78:21-22 ("...I heard somebody make a remark about something, 'Get that
crazy out of here.  He bringing heat up on the dorm.'")).  Because of this threat,
the Medical Record indicates, Plaintiff was transferred from the OBCC mental
observation unit into a cell in the main intake of OBCC.  (Medical Record 41).
Plaintiff's testimony indicates that he had already been transferred to the
OBCC general population cell by the time of Bederman's second interview.
(Jackson Dep. 91:8-11 ("I was in the cell.  In the receiving room, he came
there.")).

In his opposition to Defendants' motion for summary judgment, Plaintiff
contends that this entire sequence of events, despite being supported by the
Medical Record and his own deposition testimony, is "completely false."  (Pl.
Opp. 4).  He insists he was never interviewed by Bederman after his meeting
with Poggioli (*id.* at 4-5), and that he was never threatened by other inmates
(*id.* at 5, 8), something he later calls a "rumor" (*id.* at 10).

Though Plaintiff testified he was unaware of any rationale for his
reassignment, he discussed this transfer within OBCC at length during his
deposition.  Plaintiff testified that when he left the receiving room in OBCC on
the day of his suicide attempt, Defendant Eason escorted him to a cell in
OBCC's general population area, where he would remain for the next week.
(Jackson Dep. 80:17-25).  Plaintiff recalled that Eason, when questioned as to
where Plaintiff would now be housed, responded, "Don't worry.  You won't be
around nobody."  (*Id.* at 98:25).  When Plaintiff reached the cell in OBCC

general population, Eason told a nearby corrections officer, "Make sure they keep his cell locked.  I don't want nobody around him." (*Id.* at 99:5-6).  This was the only interaction Plaintiff had with Eason.  (*Id.* at 98:9-12).

Plaintiff testified that during his week in the OBCC general population cell, beginning on January 19, 2012, he was only let out to shower twice and the rest of the time was confined, even when the other cells would open to release inmates for recreation.  (Jackson Dep. 86:1-4, 99:13-16).  Plaintiff acknowledged that he never asked to be let out of his cell for recreation, never asked to be sent to the infirmary, never sought an appointment with a mental health professional, and never sought to file a grievance about this period of his confinement.  (*Id.* at 99:17-24, 101:18-102:15, 111:13-113:22).

Plaintiff recalled seeing a mental health professional once during this week.  The Medical Record tells the same story, reflecting an interview with a clinician on January 22, 2012, three days after his transfer out of the OBCC mental health observation unit.  (Medical Record 37-38).  During this interview, Plaintiff once again repeated his request for transfer back into C-71 in AMKC. (*Id.* at 37).  Though Plaintiff's recall of this interview was limited, his deposition testimony confirms this point.  (Jackson Dep. 83:3-12).  The Medical Record also indicates that Plaintiff denied any suicidal ideation and informed that he was regularly taking his psychoactive medications.  (Medical Record 37-38).

Plaintiff's deposition testimony is in some tension with this last item of the report from his interview on January 22.  Plaintiff testified that he only specifically remembered receiving medication "one time" during this week

10

(Jackson Dep. 106:3-4), but also acknowledged that "it is possible" that there were other occasions on which he received medication that he did not remember (*id.* at 105:19-22).  Plaintiff also testified that, though he could not recall the content of any interview, he would have told the mental health professional who interviewed him during this week whether he was having problems receiving medication.  (*Id.* at 104:19-105:11).  Plaintiff clarified that he was not accusing Defendants Eason, Poggioli, or Bederman of any involvement in any nonreceipt of his medication that he may have experienced. (*Id.* at 110:16-111:9).

Plaintiff had a parole hearing on January 25, 2012, during which he told the presiding judge "[a]bout what was happening to [him] at OBCC, ... being suicidal and not receiving no new treatment," and the attempted suicide episode of the previous week.  (Jackson Dep. 135:1-3).  Plaintiff's Legal Aid attorney then contacted the facility, and on Plaintiff's return he was sent directly to a mental health interview, where he once again repeated his desire to return to AMKC and discussed being "unstable and uncomfortable" throughout his time in OBCC.  (Medical Record 31).  Asked about suicidal ideation, Plaintiff responded that he had "thoughts from time to time" based on being in OBCC, that he wanted to return to AMKC where his nephew was incarcerated, and that he was "gonna say that [i.e., claim suicidal ideation] to go back there."  (*Id.*).

Poggioli interviewed Plaintiff the same day.  Poggioli's notes indicate his clinical judgment that Plaintiff was "utilizing [coercive] threats of self[-]harm in

11

order to facilitate [a] housing change of his preference." (Medical Record 34).
Poggioli also noted the contradiction between Plaintiff's threats of suicide and
his "hope of being accepted into an inpatient drug program in lieu of state
time" with respect to his pending criminal charges. (*Id.*). Despite this
judgment, Poggioli nonetheless had Plaintiff transferred back to suicide watch
in C-71 in AMKC "as a precautionary measure." (*Id.*)

Two days later, back in AMKC, Plaintiff was again interviewed by a
clinician, who noted that Plaintiff "expresse[d] interest in various treatment
programs [in AMKC], although his genuine motivation for participating in the
programs [was] suspect considering his stronger focus on securing preferential
housing." (Medical Record 24). The clinician recorded her clinical judgment
that Plaintiff was "specifically focused on avoiding transfer back to OBCC" and,
perhaps more importantly, that Plaintiff's "thoughts and behavior appear[ed]
clearly goal-directed...." (*Id.*). Plaintiff's suicide watch status was
discontinued. The following day, a nurse practitioner evaluated him to confirm
that the discontinuation of suicide watch had not left Plaintiff at risk; Plaintiff
responded that he was fine with his status and did not object to being housed
either in mental health observation or in the general population, so long as he
did not return to OBCC.

## B.   Procedural Background

Plaintiff filed the Complaint in this action one month later, on February
22, 2012, naming three individuals: Dr. E. Bederman, Dr. Petrola, and Captain
Eason. (Compl. 1). He also named two unidentified individuals and two

groups of unknown individuals: OBCC Psychiatrists, AMKC Psychologist, OBCC Officer of Admissions Intake, and Unknown Officers in Charge of Housing/Transfers at AMKC.  (*Id.*).  Read broadly, the Complaint apparently seeks both money damages for his psychological injuries, pain, and suffering, as well as injunctive relief "ensuring such treatment will not continue at OBCC facility."  (*Id.* at 5).

The Court[4] issued an Order of Service on May 17, 2012, concluding that the Complaint included sufficient information to enable the New York State Department of Correctional Services to identify one of the unknown parties named in the complaint: "officers responsible for implementing housing and transfer orders from AMKC psychologist Dr. Petrola in the late night of January 19 and early morning of January 20, 2012."  (Dkt. #9).  The City of New York responded to that Order of Service in a letter received November 13, 2012, identifying Defendants Bederman and Poggioli, and explaining that it was impossible at that time to determine the identities of any of the officers responsible for the transfers of which Plaintiff complained.  (Dkt. #24).

The Court ordered the parties to appear for an initial pretrial conference on January 14, 2013.  (Dkt. #25).  Plaintiff failed to appear at this conference. (Dkt. #26).  The Court ordered Plaintiff to file a letter by January 30, 2013, showing cause why his case should not be dismissed for failure to prosecute.

---

[4]   This action was at that time before the Honorable Laura Taylor Swain, United States District Judge for the Southern District of New York.  Judge Swain referred the case to the Honorable Gabriel W. Gorenstein, Magistrate Judge for the Southern District of New York, on May 30, 2012, to supervise general pretrial proceedings.  (Dkt. #12).  It was reassigned from Judge Swain to the undersigned on June 24, 2013.  (Dkt. #48).

(Dkt. #27).  Plaintiff responded on January 28, 2013, explaining that he had been detained in a correctional facility and unable to attend the conference. (Dkt. #28).  The Court rescheduled the pretrial conference for February 15, 2013.  (Dkt. #30).  The Court thereafter issued an Order on February 19, 2013, setting a discovery schedule, instructing Plaintiff to serve the Complaint on Bederman, inviting him to file an Amended Complaint identifying additional parties by March 12, 2013, and explaining to Plaintiff that certain individuals described in his Complaint could not, based on the information therein provided, be identified.  (Dkt. #31).

Plaintiff filed a motion to amend the Complaint on February 26, 2013, this time naming Eason, Bederman, and Poggioli, as well as three groups of unknown officers: "unknown officers in charge of transfer/housing at AMKC on 1/3/12"; "unknown officers in charge of housing/transfer to OBCC on 1/18/12"; and "unknown officers in charge of housing/transfer from OBCC 4L to OBCC 3N on 1/19/12."  (Dkt. #32).  The Court granted that motion to amend on April 2, 2013, and the Amended Complaint was accordingly filed the same day.  (Dkt. #35).  The Amended Complaint seeks "monetary damages for pain, suffering[,] and psychological injuries involving excessive cruelty and inadequate treatment," as well as injunctive relief "ensuring such treatment will not continue at OBCC facility nor AMKC."  (Am. Compl. 5).  The named Defendants answered the Amended Complaint on April 22, 2013.  (Dkt. #37, 39, 41).

The named Defendants moved for summary judgment on October 15, 2013.  (Dkt. #58-64).  Plaintiff filed his opposition papers on November 14, 2013.  (Dkt. #66).  The motion was fully submitted when Defendants replied on December 11, 2013.  (Dkt. #67).

On April 29, 2014, the Court issued an Order explaining that the unidentified Defendants were not fairly in this case (inasmuch as they had never been named or served), and notified Plaintiff that his claims against those Defendants would be dismissed if he failed to identify and serve them within 30 days, a period that expired on May 29, 2014.  (Dkt. #78).  Plaintiff has filed no response, nor has he identified or served the unidentified Defendants.

## DISCUSSION

### A.    Applicable Law

#### 1.    Summary Judgment Generally

Under Fed. R. Civ. P. 56(a), summary judgment may be granted only if all the submissions taken together "show[] that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

     If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings. *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts", *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (internal quotation marks omitted), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles* v. *Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials cannot by

themselves create a genuine issue of material fact where none would otherwise exist." *Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher* v. *Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)).

### 2.  Summary Judgment in *Pro Se* Cases

When considering a motion for summary judgment, the Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson* v. *Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010) (citing *LaSalle Bank Nat'l Ass'n* v. *Nomura Asset Capital Corp.*, 424 F.3d 195, 205 (2d Cir. 2005)). In a *pro se* case, the Court must go one step further and liberally construe the party's pleadings "to raise the strongest arguments that they suggest." *McPherson* v. *Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos* v. *Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

Nonetheless, a *pro se* litigant must still be held to the normal requirements of summary judgment, and "bald assertion[s]," unsupported by evidence, will not overcome a motion for summary judgment. *See Carey* v. *Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991); *Stinson* v. *Sheriff's Dep't*, 499 F. Supp. 259, 262 (S.D.N.Y. 1980) (observing that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended"). Litigants "should be on notice from the very publication of Rule 56(e) that a party faced with a summary judgment motion may not rest upon the mere allegations or denials of the party's pleading and

that if the party does not respond properly, summary judgment, if appropriate, shall be entered against him." *Champion* v. *Artuz*, 76 F.3d 483, 485 (2d Cir. 1996) (quoting *Graham* v. *Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988)).

### 3.  Section 1983 Claims for Deliberate Indifference to Serious Medical Needs

"To state a section 1983 claim, a plaintiff must allege a violation of his constitutional or statutory rights by a person acting under the color of state law." *Manley* v. *Mazzuca*, No. 01 Civ. 5178 (KMK), 2007 WL 162476, at *4 (S.D.N.Y. Jan. 19, 2007) (citing *West* v. *Atkins*, 487 U.S. 42, 48 (1988)). "The Eighth Amendment to the United States Constitution prohibits the infliction of cruel and unusual punishments on prison inmates." *Brown* v. *Selwin*, 250 F. Supp. 2d 299, 307-08 (S.D.N.Y. 1999) (internal quotation marks omitted), *aff'd*, 29 F. App'x 762 (2d Cir. 2002) (summary order).  The Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' … proscribed by the Eighth Amendment." *Estelle* v. *Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg* v. *Georgia*, 428 U.S. 153, 173 (1976) (joint opinion)).

A deliberate indifference claim has "two components — one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Sims* v. *Artuz,* 230 F.3d 14, 20 (2d Cir. 2000).  The objective component requires that the medical need at issue must be "sufficiently serious," *Wilson* v. *Seiter*, 501 U.S. 294, 298 (1991), meaning that it involved the deprivation of "'the minimal civilized measure of life's

18

necessities,'" *id.* at 298 (quoting *Rhodes* v. *Chapman*, 452 U.S. 337, 347 (1981)).

A "plaintiff must plead two sub-components to satisfy the objective test." *Paulin* v. *Figlia*, 916 F. Supp. 2d 524, 534 (S.D.N.Y. 2013). The objective test first asks "whether the prisoner was actually deprived of adequate medical care." *Salahuddin* v. *Goord*, 467 F.3d 263, 279 (2d Cir. 2006). A prison official has a duty to provide only reasonable care, not ideal care, and "prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Farmer* v. *Brennan*, 511 U.S. 825, 845 (1994). "[C]onversely, failing 'to take reasonable measures' in response to a medical condition can lead to liability." *Salahuddin*, 467 F.3d at 280 (quoting *Farmer*, 511 U.S. at 847). "In addition, '[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.'" *Idowu* v. *Middleton*, No. 12 Civ. 1238 (LGS), 2013 WL 4780042, at *5 (S.D.N.Y. Aug. 5, 2013) (quoting *Chance* v. *Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998)).

"Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin*, 467 F.3d at 280. "For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." *Id.* "A serious medical condition

exists where the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Harrison*, 219 F.3d at 136 (internal quotations omitted). "'Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find [it] important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain.'" *Idowu*, 2013 WL 4780042, at *5 (quoting *Salahuddin*, 467 F.3d at 280) (internal quotation marks omitted) (alteration in *Idowu*). "In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.'" *Salahuddin*, 467 F.3d at 280 (quoting *Smith* v. *Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (alterations in *Salahuddin*)).

"The subjective part of the deliberate indifference analysis focuses on whether the charged official acted 'with a sufficiently culpable state of mind.'" *Gonzalez* v. *Jones*, No. 07 Civ. 2126 (LAP), 2010 WL 533856, at *14 (S.D.N.Y. Feb. 11, 2010) (quoting *Salahuddin*, 467 F.3d at 280), *aff'd sub nom. Gonzales* v. *Nowak*, 443 F. App'x 615 (2d Cir. 2011) (summary order). "In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it

suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Essentially, a defendant must, at a minimum, act with reckless disregard of a serious risk of harm. However, 'recklessness entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent.'" *Gonzalez*, 2010 WL 533856, at *14 (quoting *Salahuddin*, 467 F.3d at 280). "'This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result.'" *Manley*, 2007 WL 162476, at *5 (quoting *Salahuddin*, 467 F.3d at 280)). "Thus, '[t]he charged official must be subjectively aware that his conduct creates such a risk,' and if a defendant sincerely and honestly believes that his conduct does not create such a risk, 'even if objectively unreasonable,' he does not possess a sufficiently culpable state of mind." *Gonzalez*, 2010 WL 533856, at *14 (quoting *Salahuddin*, 467 F.3d at 281).

"Disagreements over medications, diagnostic techniques … forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment." *Sonds* v. *St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001). "Medical malpractice does not rise to the level of a constitutional violation unless the malpractice involves culpable recklessness — an act or a failure to act by a prison doctor that evinces a conscious disregard of a substantial risk of serious harm." *Hill* v. *Curcione*,

657 F.3d 116, 123 (2d Cir. 2011) (internal quotation marks and alteration omitted); *see also Harrison* v. *Barkley*, 219 F.3d 132, 139 (2d Cir. 2000) ("[T]he mere malpractice of medicine in prison does not amount to an Eighth Amendment violation."); *Chance*, 143 F.3d at 703 ("[N]egligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim.").

"Although the question of whether a defendant acted with a particular state of mind is frequently a factual one appropriate for resolution by a jury, the Second Circuit has made clear that summary judgment can be appropriate on the subjective prong of an inadequate-medical-care claim...." *Castillo* v. *Rodas*, No. 09 Civ. 9919 (AJN), 2014 WL 1257274, at *6 (S.D.N.Y. Mar. 25, 2014). "Plaintiff must point to actual evidence in the record permitting the inference that Defendants acted with deliberate indifference; he cannot rely on conjecture or speculation." *Id.*

## B.    Application

### 1.    The Court Will Consider Plaintiff's Arguments Despite His Failure to Comply with Local Rule 56.1

Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York (the "Local Rules") requires a party moving for summary judgment to submit a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Rule 56.1(a). The movant's asserted facts are deemed to be admitted unless

specifically controverted by the statement served by the opposing party.  Local Rule 56.1(c).  *Pro se* litigants are "not excused from meeting the requirements of Local Rule 56.1."  *Wali* v. *One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009).

Defendants filed a Rule 56.1 Statement dated October 15, 2013.  (Dkt. #64).  Plaintiff's opposition papers to Defendants' motion for summary judgment (Dkt. #66) are, in all practicality, a statement pursuant to Rule 56.1 and a counterstatement to Defendants' Rule 56.1 Statement.  Despite Plaintiff's incomplete compliance with the Local Rules, the Court retains discretion "to consider the substance of the plaintiff's arguments."  *Wali*, 678 F. Supp. 2d at 178 (citing *Holtz* v. *Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]hile a court is not required to consider what the parties fail to point out in their Local Rule 56.1 Statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement." (internal quotation marks omitted))); *see also Hayes* v. *Cnty. of Sullivan*, 853 F. Supp. 2d 400, 406 n.1 (S.D.N.Y. 2012) ("In light of Plaintiff's *pro se* status, the Court overlooks his failure to file a Local Rule 56.1 Statement and conducts its own independent review of the record.").

## 2.     The Unidentified Defendants Are Dismissed

The Amended Complaint names, in addition to the three individual Defendants who now move for summary judgment, three additional groups of unidentified individuals whom Plaintiff seeks to sue: "unknown officers in charge of transfer/housing at AMKC on 1/3/12"; "unknown officers in charge

23

of housing/transfer to OBCC on 1/18/12"; and "unknown officers in charge of housing/transfer from OBCC 4L to OBCC 3N on 1/19/12." (Am. Compl.). As explained in the Court's Order of April 29, 2014, the Court and Defendants have labored to help Plaintiff identify these individuals. (Dkt. #78). Indeed, only through Defendants' aid was Poggioli identified and ultimately named in this action.

The Court's April 29 Order put Plaintiff on notice that a failure to serve the unidentified Defendants within 30 days of that date would result in the dismissal without prejudice of his claims against them pursuant to Federal Rule of Civil Procedure 4(m). That time has now expired and Plaintiff has not identified or served these individuals or otherwise responded to the Court's April 29 Order. Accordingly Plaintiff's claims against the unidentified Defendants are dismissed without prejudice; he may seek to sue these individuals again one day if he identifies them, and if his claims are not then barred on any other ground. He may not, however, sue them in this action. Only the identified Defendants — Bederman, Poggioli, and Eason — are still present. *See, e.g.*, *Delrosario* v. *City of N.Y.*, No. 07 Civ. 2027 (RJS), 2010 WL 882990, at *5 (S.D.N.Y. Mar. 4, 2010) (*sua sponte* dismissing claims against John Doe defendants for failure to prosecute "[w]here discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants"); *Coward* v. *Town & Vill. of Harrison*, 665 F. Supp. 2d 281, 301 (S.D.N.Y. 2009) ("Where a plaintiff 'has had ample time to identify' a John Doe defendant but gives 'no indication that he has made any effort to discover

the [defendant's] name,' ... the plaintiff 'simply cannot continue to maintain a suit against' the John Doe defendant." (quoting *Kearse* v. *Lincoln Hosp.*, No. 07 Civ. 4730 (PAC), 2009 WL 1706554, at *3 (S.D.N.Y. June 17, 2009)) (first alteration in *Coward*)); *Keesh* v. *Artuz*, No. 97 Civ. 8417 (AKH), 2008 WL 3166654, at *2 (S.D.N.Y. Aug. 6, 2008) ("Even after discovery, plaintiff has failed to identify the 'John Doe' and 'Jane Doe' defendants.  Accordingly, the complaint against them must be dismissed.").

### 2.    Injunctive Relief Is Unavailable

"'[A]ctions involving claims for prospective declaratory or injunctive relief are permissible provided the official against whom the action is brought has a direct connection to, or responsibility for, the alleged illegal action.'" *Loren* v. *Levy*, No. 00 Civ. 7687 (DC), 2003 WL 1702004, at *11 (S.D.N.Y. Mar. 31, 2003) (quoting *Davidson* v. *Scully*, 148 F. Supp. 2d 249, 254 (S.D.N.Y. 2001)). "An injunction may be issued only if the State official has the authority to perform the required act." *Lyerly* v. *Phillips*, No. 04 Civ. 3904 (PKC), 2005 WL 1802972, at *3 (S.D.N.Y. July 29, 2005).  Prospective judicial relief relating to prison conditions must meet the requirements of 18 U.S.C. § 3626, part of the Prison Litigation Reform Act.  This provision requires that injunctions be "narrowly drawn" and employ "the least intrusive means necessary." 18 U.S.C. § 3626(a)(1)-(2).

The nature of the injunctive relief Plaintiff seeks is not at all clear. Presumably, he intends to obtain something in the way of an injunction prohibiting facility transfers of inmates with mental health needs to facilities

with lower levels of care.  But none of the named Defendants — nor, for that matter, any of the unidentified Defendants, even had they not already been dismissed as parties — has the power to effect facility-wide change in prisoner classification policies or transfer guidelines in OBCC or AMKC.  Eason in particular lacks any capacity to control how inmates are categorized for mental health purposes or how those categorizations are given effect in housing assignments.  But neither Bederman nor Poggioli occupies any supervisory position that would give him the authority or responsibility to alter the facilities' approach to housing inmates with mental health needs.

Plaintiff may, alternatively or additionally, have sought a narrow injunction forcing the facilities to maintain 24-hour accessible mental health professionals.  (*See* Jackson Dep. 72:15-17 ("You can't just tell a person they got to wait until the morning if they are having, you know, certain issues going on.")).  Injunctive relief would be all the more unavailable on this score; none of the Defendants, named or unidentified, could possibly have the power to influence staffing and resource allocations at multiple facilities on so significant a scale.  Even if Plaintiff had a colorable constitutional claim — which, as explained below, he does not — he could not obtain injunctive relief in consequence.[5]

---

[5]     Money damages are not necessarily precluded, insofar as Defendants had the requisite personal involvement in some of the incidents giving rise to Plaintiff's claims.  *See Grullon* v. *City of New Haven*, 720 F.3d 133, 138-39 (2d Cir. 2013).  Instead, as explained below, the lack of a valid constitutional claim dooms Plaintiff's quest for money damages.

### 3.  Official Capacity Damages Claims Are Dismissed

The Eleventh Amendment, as a general matter, makes states immune from suit.  *Seminole Tribe of Florida* v. *Florida*, 517 U.S. 44, 54 (1996). Eleventh Amendment immunity applies also to state officials sued in their official capacities.  *Pennhurst State School & Hosp.* v. *Halderman*, 465 U.S. 89, 101-02 (1984).  "Employees of DOCS and its facilities, when sued in their official capacities, have been held to be subject to the State's Eleventh Amendment immunity."  *Lyerly*, 2005 WL 1802972, at *3.  "The eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his individual or personal capacity."  *Farid* v. *Smith*, 850 F.2d 917, 921 (2d Cir. 1988) (internal quotation marks omitted).  Thus, to the extent Plaintiff sues Defendants in their official capacities, his claims are dismissed.  He may still, however, seek money damages against Defendants in their personal capacities.

### 4.  The Named Defendants Did Not Violate Plaintiff's Rights

Construed very generously, Plaintiff complains of four distinct events in January 2012 during which his Eighth Amendment rights were ostensibly violated: his transfer into the cold AMKC cell; his transfer out of the AMKC program; the denial of his requests for psychiatric care that began during the evening of January 17, 2012, and concluded the following day; and his transfer to and confinement in a general population cell in OBCC from January 19-25, 2012.  As a matter of law, Plaintiff cannot demonstrate the components of a

deliberate indifference claim with respect to any of these issues.  Accordingly, Defendants' motion for summary judgment is granted.

### a.   The January 3, 2012 Transfer

Plaintiff first might understandably complain about having been transferred from his initial dormitory housing into a cold, dark cell without a blanket overnight on January 3, 2012.  (Jackson Dep. 96:8-9 ("They never explained to me why they took me out of [an AMKC dormitory unit] in the first place, put me in that cold cell.")).  The Court sympathizes with Plaintiff's frustration about these conditions.[6]  However, the next morning, when Plaintiff informed a corrections officer that he was experiencing suicidal ideation, he was taken directly to be seen by a mental health professional who promptly assigned him to suicide watch and placed him in an intensive mental health treatment environment in C-71.  There was no delay or deprivation of care in this circumstance.

Nor could Plaintiff face a serious medical episode of any kind in connection with this transfer.  No sooner did Plaintiff express a need for mental health services than he was transferred to substantially more desirable

---

[6]     Plaintiff could conceivably have intended to state a separate Eighth Amendment claim for the suffering he experienced from his night in this cell.  *See Gaston* v. *Coughlin*, 249 F.3d 156, 165 (2d Cir. 2001) (noting that prolonged exposure to cold can constitute an Eighth Amendment violation).  Plaintiff has certainly never indicated as much and his Complaint is expressly focused on and couched in the terms of deliberate indifference to serious medical needs.  Even if so, however, the conditions Plaintiff experienced during this single night do not approach the level of severity the Second Circuit has held necessary to constitute impermissibly cruel and unusual punishment in such circumstances.  *See Trammell* v. *Keane*, 338 F.3d 155, 164-65 (2d Cir. 2003) (collecting cases and discussing the severity and duration of cold exposure necessary to support an Eighth Amendment claim).

housing with an aggressive treatment program Plaintiff enjoyed very much. Moreover, none of the named Defendants had any involvement of any kind in Plaintiff's transfer to or from this problematic AMKC cell.  "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation."  *Grullon*, 720 F.3d at 138.  Even if Plaintiff's transfer to the AMKC cell could pose an Eighth Amendment violation, if could not be maintained against the Defendants still named in this action.  But even to the extent that the "unknown officers in charge of transfer/housing at AMKC on 1/3/12" sued in the Amended Complaint and now dismissed from this case could be liable for such a violation, this transfer did not deprive Plaintiff of any medical care.

### b.   The January 17, 2012 Transfer Out of AMKC

The second possible basis for liability, and one Plaintiff complains of much more fiercely, was Plaintiff's subsequent transfer out of the treatment program in AMKC into the mental observation unit in OBCC.  (Jackson Dep. 93:19-24 ("[A] lot of things of injustice were done to me.  And one of the things of injustice that was done to me was, they took me out of a program that I was comfortable with and just transferred me for no reason at all."), 96:4-5 ("I just wanted to get back to the environment I was in.  Why they take me out of an environment?"); *see also id.* at 97:15-16 ("But in my situation, I am in a program.  I got a mental health problem and you can't just [transfer me]....  And that's what this is about.")).  First, as above, none of the named

29

Defendants had any personal involvement in Plaintiff's transfer to OBCC and so cannot be liable for money damages on this basis.

But even if Plaintiff were able to pursue recovery against the "unknown officers in charge of housing/transfer to OBCC," he has no claim for relief. "'[T]he fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.'" *Idowu*, 2013 WL 4780042, at *5 (quoting *Chance*, 143 F.3d at 703). Plaintiff's deposition testimony makes clear that he preferred the care in AMKC to that available elsewhere on Rikers Island. (Jackson Dep. 64:17-21 ("I just liked the whole thing. I liked, number one, getting the attention I was getting, knowing when I had an issue, someone was available I could talk to, because you don't have that. You don't have that in prison, and that's really needed."), 131:18-21 ("For me at that time, my state of mind, [AMKC] was the best place for me to be because I had treatment, therapy. Everything was clinical from a mental standpoint.")). But it simply cannot state an Eight Amendment violation to say that Plaintiff did not receive the care he desired. "As long as the medical care is adequate, there is no Eighth Amendment violation." *Sonds*, 151 F. Supp. 2d at 311. Plaintiff was not deprived of medical care by his transfer into a facility where he experienced less frequent contact with medical professionals; his care was merely adjusted to reflect the judgment of his treating medical professionals regarding his needs.

Nor, even if seen as a deprivation, was it possibly a serious one. Though Plaintiff clearly regarded his transfer out of AMKC to OBCC as a serious error

on the part of his physicians, any ostensibly serious consequences of that transfer are actually only fairly traceable to the nine hours he spent in OBCC without psychiatric care.  The transfer to OBCC itself did not constitute a "'delay or interruption in treatment'" so as to implicate deliberate indifference analysis.  *Salahuddin*, 467 F.3d at 280 (quoting *Carpenter*, 316 F.3d at 185).

What is more, there is no basis whatsoever to conclude that Plaintiff was in any state of unusual need for care at the time the decision to transfer him was made.  Plaintiff does not allege that he was in any ongoing state of distress prior to receiving upsetting news on January 17, and the Medical Record contains ample support for the clinical judgment reached by Plaintiff's physicians that Plaintiff could safely be "treated at a lower level of care." (Medical Record 63; *see also id.* at 60-63, 65-66).  Even granting that the sad news Plaintiff received on January 17 may have precipitated an emotional crisis, no individual at AMKC could have been aware of this sudden heightened need for care until after his transfer was approved.  Yet the subjective component of the deliberate indifference analysis requires that a defendant "'act or fail to act while actually aware of a substantial risk that serious inmate harm will result.'"  *Manley*, 2007 WL 162476, at *5 (quoting *Salahuddin*, 467 F.3d at 280).  On Plaintiff's own account, any urgent need for care he may have experienced on January 17 could not have been known to any individual involved in his transfer because it did not arise until after the fact.

31

### c.   The January 18-25 Confinement in OBCC General Population

The third possibility is that Plaintiff may contend he was denied medical care during the week he spent in the OBCC general population cell from January 18 to January 25, 2012.  There are two distinct dimensions to this possible basis for Plaintiff's claim: a failure to receive counseling, and a failure to receive medication.  Neither suffices.

### i.   Failure to Receive Counseling

Plaintiff might argue that he received inadequate counseling during his week in the OBCC general population cell.  (Jackson Dep. 82:7-12 ("Q: Did you go to mental health while you were in that cell?  A: I think they called me for one time.  I do remember coming out that cell one time for mental health....")).  Conceivably, Plaintiff could argue that the level of care he needed, as known to mental health staff in the facility, required more regular counseling than he received during this period.

First of all, no Defendant had any involvement with making mental health interview appointments for Plaintiff during this week.  For these reasons, all lack the requisite personal involvement with such a claim and Plaintiff cannot maintain one against them.

Even if Plaintiff had named some appropriate defendant on this score, an officer who provides reasonable care cannot be liable under the Eighth Amendment.  *Farmer*, 511 U.S. at 847.  Plaintiff may contend that he required more treatment during this interval than he received.  But even viewing the facts in the light most favorable to Plaintiff, the shortness of the period, the fact

that Plaintiff did meet with a mental health professional during that period, and Plaintiff's failure to request additional counseling throughout this period — even during his mental health interview — make it impossible for him to argue now that he was actually deprived of care.  He was not.

Moreover, Plaintiff's transfer to and confinement in the OBCC general population cell was justified by Plaintiff's own report of a possible risk to his safety.  Plaintiff testified that he informed the medical staff at OBCC that his attempted suicide episode had occasioned hostile commentary from other inmates in the OBCC mental observation unit.  (Jackson Dep. 78:6-79:2).  The Medical Record says the same, indicating that Plaintiff told Bederman he had been threatened by inmates in the mental observation unit and that Plaintiff had been rehoused as a precautionary measure in consequence.  (Medical Record 41 ("When I went back to [the mental health observation unit] they said they were going to jump me for bringing heat to the house for that hang up yesterday.'"); *compare* Jackson Dep. 78:21-22 ("...I heard somebody make a remark about something, 'Get that crazy out of here.  He bringing heat up on the dorm.'")).

While most claims of deliberate indifference to serious medical needs "do not implicate 'competing institutional concerns,'" the Second Circuit has clarified that where a specific action "plainly implicate[s] prison safety and discipline," a court must consider whether the action "was reasonably calculated to restore prison discipline and security and, in that purposive context, whether the officials were deliberately indifferent to [inmate] health

and safety." *Trammell*, 338 F.3d at 163 (quoting *Whitley* v. *Albers*, 475 U.S. 312, 320 (1986)).  Plaintiff's confinement in the OBCC general population cell was clearly intended to isolate him from any possible threat to his safety, a precaution elicited by Plaintiff's own report of overheard threatening remarks during (or on account of) his attempted suicide episode.  Plaintiff recalled that Eason, when Plaintiff asked where he would now be housed, responded, "Don't worry.  You won't be around nobody."  (Jackson Dep. 98:25).  When Plaintiff reached the cell in OBCC general population, Eason told a nearby corrections officer, "Make sure they keep his cell locked.  I don't want nobody around him." (*Id.* at 99:5-6).  The record here clearly demonstrates that transferring Plaintiff out of the mental observation unit and into a secure setting was reasonably calculated to ensure prison safety and safeguard his health.  In conjunction with the judgment reached by numerous examining medical staff regarding the level of care required by Plaintiff's condition, his confinement in the OBCC general population cell from January 19 to January 25 with a mental health interview on January 22 did not constitute an unreasonable level of care.[7]

This is all the more true in light of the broad medical consensus reached after his attempted suicide episode on January 18, 2012, that Plaintiff was engaging in goal-directed behavior aimed at manipulating prison personnel into transferring him into preferential housing.  (Medical Record 41-42, 47-48, 49-

---

[7]    This is the only claim Plaintiff can conceivably state against Eason, as Eason's alleged involvement in the events at issue extends no further than escorting Plaintiff from the mental observation unit to the general population cell.  Eason is thus necessarily free from liability in this action.

50, 55).  It was the clinical conclusion of several medical personnel who

examined Plaintiff, including Bederman,[8] that Plaintiff's episode was a gesture

designed only to achieve a return to the program in AMKC from which he had

just been removed.  That judgment was reached independently by multiple

medical professionals and Plaintiff has no basis to argue that those individuals

were disingenuous or employing apparent medical reasoning as a pretext for

some other purpose.  A defendant must "act with reckless disregard of a

serious risk of harm, … and if a defendant sincerely and honestly believes that

his conduct does not create such a risk, 'even if objectively unreasonable,' he

does not possess a sufficiently culpable state of mind."  *Gonzalez*, 2010 WL

533856, at *14 (quoting *Salahuddin*, 467 F.3d at 281).  Here no such culpable

---

[8]     Plaintiff, in his opposition to Defendants' motion, claims that the record of Bederman's interview with him on January 19, 2012, during which Bederman recorded his observation that Plaintiff appeared to be "attempting to malinger psychosis" (Medical Record 49), is "completely *false*" (Pl. Opp. 4 (emphasis in original)).  He contends that the interview never took place (*id.* at 4-5).  He also insists that he was never threatened by other inmates (*id.* at 5, 8), but later retreats from that position and refers to the threats as a "rumor" (*id.* at 10).  The fact remains that Plaintiff testified at his deposition that he recalled a second interview with Bederman after his attempted suicide episode, and his recollection of that interview tallies in some, though not all, respects with Bederman's account of it in the Medical Record.  (Jackson Dep. 90:21-91:15; Medical Record 41-42).  "It is well settled in [the Second Circuit] that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment."  *Mack* v. *United States*, 814 F.2d 120, 124 (2d Cir. 1987).  Some exceptions to that rule exist: where, for example, "an issue was not fully explored in the deposition, or the deponent[']s responses were ambiguous," *Gilani* v. *GNOC Corp.*, No. 04 Civ. 2935 (ILG), 2006 WL 1120602, at *3 (E.D.N.Y. Apr. 26, 2006) (citing *Palazzo* v. *Corio*, 232 F.3d 38, 43 (2d Cir. 2000)), or "where a party's conflicting affidavit statements are corroborated by other evidence," *id.*  This is not such a case.  Plaintiff swore in his deposition that he participated in a second interview with Bederman.  He now claims that he did not.  "The procedural latitude granted to *pro se* litigants … 'typically does not extend so far as permitting a plaintiff to supplement the claims in his complaint with additional allegations in his motion papers.'"  *Zappulla* v. *Fischer*, No. 11 Civ. 6733 (JMF), 2013 WL 1387033, at *8 (S.D.N.Y. Apr. 5, 2013) (quoting *Salemo* v. *Murphy,* No. 11 Civ. 2525 (TPG), 2012 WL 4714765, at *2 (S.D.N.Y. Sept. 27, 2012)).  Plaintiff may not escape his testimony now by contradicting it in his brief.

state of mind can exist in the face of the sincerely held medical belief that Plaintiff was attempting to manipulate prison personnel.

This would be true even if the medical belief in question were objectively unreasonable.  It was not.  Defendants further support the medical judgment reached at the time with expert testimony from Dr. Mark Goldblatt.  Dr. Goldblatt examined the Medical Record in this case and, as relevant here, independently concluded that the medical judgment in question was correct: Plaintiff "did not seriously attempt to commit suicide.  Rather he was feigning a suicidal gesture in an attempt to force the medical and mental health staff to transfer him back to" C-71 in AMKC.  (Goldblatt Aff. ¶ 12).  In relying on this affidavit, the Court notes that expert affidavits may be rejected if the "expert's opinions rest on pure speculation or are directly contradicted by the factual record or are otherwise unworthy of even arguable belief."  *Langley* v. *Coughlin*, 715 F. Supp. 522, 541 (S.D.N.Y. 1989).  Here, however, Defendants' expert sets out the facts at issue and explains the bases for his conclusion that the medical judgment and actions of the medical personnel involved, including Defendants, were reasonable and appropriate.  In consequence, the Court finds that it was at least not objectively unreasonable for Defendants to conclude that Plaintiff required no elevated level or cadence of psychological treatment even in the immediate aftermath of his attempted suicide episode, rendering the mindset of the individuals involved all the less culpable.

### ii.    Inadequate Medication

Plaintiff might alternatively point to his week in the OBCC cell as an example of actual deprivation of medical care, based on his allegation that he only received medication a single time during the seven days he spent in the cell.  (Jackson Dep. 90:13-14 ("I do remember not getting medication every night while I was in that cell for seven days."), 88:23-24 ("I remember actually taking medication one time while I was at OBCC.")).

Once again, no Defendant named here had any involvement with the distribution of medication to Plaintiff during his OBCC confinement.  Indeed, Plaintiff testified that he had no reason to believe that any of the named Defendants had anything to do with any deprivation of medication he may have experienced.  (Jackson Dep. 110:16-111:9).

More to the point, Plaintiff acknowledged that "it is possible" he received medication more regularly than he recalled at his deposition, and that he "wouldn't argue with the record" if his memory were contradicted.  (Jackson Dep. 105:22-23).  He also admitted that, when he saw a mental health professional during this week, he would have mentioned if he were "having any problems with his medication"; he acknowledged that, if he were not having problems receiving medication, he "probably [would have] said nothing" during his mental health interview regarding his medication.  (*Id.* at 104:21-24).  The record of Plaintiff's mental health interview on January 22, during his week in the OBCC general population cell, indicates that he "state[d] he takes [his

37

medication] regularly." (Medical Record 37). On this basis, it is quite unlikely Plaintiff faced any actual deprivation at all.

To be fair, Plaintiff suggested elsewhere in his deposition that he thought it was possible that it was not until after Plaintiff met with the mental health professional on January 22 that Plaintiff stopped receiving his medication. (Jackson Dep. 89:19-21). At worst, then, on his own testimony, Plaintiff may not have received medication on the 22nd, 23rd, and 24th of January, as by January 25th he had succeeded in achieving transfer back to suicide watch in AMKC.[9] It is conceivable that such a denial could at least satisfy the "actually deprived" sub-component of the objective prong.[10] *See Clay* v. *Kellmurray*, 465 F. App'x 46, 47 (2d Cir. 2012) (summary order) ("Even if we were to determine that leaving Clay unmedicated for three days constituted a sufficiently serious deprivation to establish the objective element of a claim of deliberate indifference....").

If otherwise substantiated, a denial of psychiatric medication could certainly satisfy the "sufficiently serious" prong of the analysis. Psychological injuries can be as debilitating as physical, and all the more difficult to treat given the difficulties in diagnosis and therapy posed by the correctional setting. *See* Stephen Allen, *Mental Health Treatment and the Criminal Justice System*, 4

---

[9]   By no means does this amount to a conclusion that Plaintiff actually failed to receive his medication on these days. Between his own admitted poor recollection and his self-confessed propensity to lie in an effort to obtain his goals, the opposite is at least as likely.

[10]   Even if so, it could not possibly satisfy the deliberate indifference test as a whole, as explained below.

38

J. HEALTH & BIOMEDICAL L. 153, 160 (2008) (describing the symptoms of depressive episodes).

But Plaintiff could not, on his own testimony, demonstrate a culpable mindset on the part of any Defendant, even had he named one potentially liable for this claim.  The Medical Record indicates that Plaintiff, when interviewed by a mental health professional during this week of confinement, did not report any depression or urgent need for care.  (Medical Record 37-38).  Plaintiff admitted as much; at his deposition, his only account of this mental health interview was that he had once again requested a transfer back to his former program at AMKC.  (Jackson Dep. 83:3-5).  And Plaintiff admitted that he never sought any attention or assistance via any other method during his week in the OBCC general population cell.  In sum, even if Plaintiff in fact failed to receive medication for three days, he cannot demonstrate that any individual was sufficiently aware of this issue to be liable for any resulting Eighth Amendment violation.

### 4.   The Denial of Psychiatric Care on the Evening of January 17

Finally, Plaintiff may claim he was deprived of adequate medical care during and after his transfer on January 17, 2012, from the program in AMKC to the mental observation unit in OBCC.  (Jackson Dep. 97:20-23 ("This is about me not getting no treatment from the time I got to OBCC until the time that I [hanged] myself, those nine hours that they didn't have a psychiatrist available for me to talk to, that's what this is about.")).  Plaintiff alleges that he repeatedly requested to see a mental health professional to cope with the

distress occasioned by the bad news he had received immediately before his transfer, but was informed that the facility had no overnight psychiatric care available.  (*Id.* at 72:5-73:1).  Plaintiff further explains that throughout this interval, he repeated the self-confessed lie that he had just learned of the death of his sister in an effort to persuade OBCC corrections officers of the importance of his request for mental health care, to no avail.  (*Id.* at 68:2-69:5, 73:4-7, 92:3-92:18).

Plaintiff does not suggest — and could not credibly do so on the record before the Court — that any of the three named Defendants had anything to do with the delay in providing access to a mental health professional on the night of January 17.  Nor could the unidentified Defendants, even were they still before the Court, conceivably have been involved in determining whether to provide Plaintiff with access to mental health treatment on the night in question after he had been transferred to OBCC.[11]  Plaintiff might conceivably be able to evade summary judgment with respect to this episode, but he cannot

---

[11]     As noted above, Plaintiff may have intended to seek injunctive relief in particular on this narrow issue, requiring prisons to maintain access to mental health care 24 hours a day.  For the reasons explained above, such injunctive relief would be barred even were Plaintiff's claim meritorious.  It bears noting here that the Court would by no means necessarily find such a policy even desirable, much less constitutionally mandated.  Ample mental health resources, on Plaintiff's own testimony, exist in both Rikers Island facilities at issue.  (Jackson Dep. 72:11-13 ("[E]verywhere else I have been, they always had a psychiatrist through the night.")).  And more to the point, "prison officials and medical officers have wide discretion in treating prisoners, and Section 1983 is not designed to permit federal courts to interfere in the ordinary medical practices of state prisons."  *Sonds*, 151 F. Supp. 2d at 311 (citing *Church* v. *Hegstrom*, 416 F.2d 449, 450–51 (2d Cir. 1969)).  Prison staff assessed Plaintiff and concluded his need for care did not require a facility with round-the-clock access to therapy, and the Court has already concluded that that judgment was not objectively unreasonable or reached with a culpable mental state of deliberate indifference.

claim that anyone he has sued here is liable on that basis, irrespective of whether he successfully identified and served them.

If the Court were nonetheless to consider the merits of Plaintiff's claim it would still fail. The claim might satisfy the first sub-component of the objective prong of the analysis. That is, a jury could conclude that it was unreasonable for corrections officers to refuse to provide Plaintiff with mental health care during this nine-hour period, especially considering Plaintiff's undisputed mental health history and conduct that evening. *See Langley*, 715 F. Supp. at 540 (collecting cases finding that delays of up to six hours in providing medical treatment can constitute an Eight Amendment violation).

Nonetheless, Plaintiff likely could not survive summary judgment as to the seriousness of this deprivation. Where, as here, "the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.'" *Salahuddin*, 467 F.3d at 280 (quoting *Carpenter*, 316 F.3d at 185) (alteration in *Salahuddin*). Plaintiff claims that the delay in obtaining psychiatric treatment provoked an attempted suicide episode on the morning of January 18. (Jackson Dep. 72:5-73:12).

The Medical Record of course paints a far more damaging picture of Plaintiff's comments about his attempted suicide episode. In the immediate aftermath of the episode, for example, Bederman interviewed Plaintiff and recorded his impression that Plaintiff was "attempting to malinger psychosis,"

41

including informing Bederman, necessarily untruthfully, that he had tried to kill himself to be with his sister, and the equally mysterious insistence that he would be "fine" if he returned to AMKC, despite claiming at the time to suffer from overwhelming auditory hallucinations. (Medical Record 49). And the following day, Bederman again interviewed Plaintiff and recorded Plaintiff admitting that he feigned his symptoms the previous day, both during and after his attempted suicide episode, to obtain transfer back to AMKC. (*Id.* at 41).

There are very significant reasons to doubt Plaintiff's version of these events. For example, Plaintiff acknowledged a previous incident in May 2011 in which Plaintiff was placed "in a dorm [he] did not want to be in and … threw a tantrum about not being in the dorm and not getting [his] medication… [and] ended up going on suicide watch…." (Jackson Dep. 130:5-8). The following exchange in reference to that prior episode, though not damning, certainly casts a shadow over Plaintiff's veracity:

> Q: Did you ever tell anybody that you were not really suicidal, but you wanted to leave your housing area in 2011?
>
> A: I don't know; I may have. People say all kind of things. People say all kind of things. People say they are going to hurt themself if they think they can get things accomplished. Some people really try to hurt [themselves], man.

(*Id.* at 128:1-8).

Plaintiff had also, as previously noted, openly acknowledged that he repeatedly lied to corrections officers and medical professionals about the

invented recent death of his sister in an effort to obtain a housing transfer. And though his deposition testimony is not clear, Plaintiff did acknowledge at least the possibility that his claims of suicidal ideation during the events giving rise to this suit may have been motivated only by his desire to return to preferred housing:

> Q: Did you ever tell a mental health provider that you only said you were suicidal so you could go back to C71?
>
> A: I may have, yeah, yeah, because, once you say you are suicidal, they got to put you on suicide watch. And the only suicide watch is in C71. So, that eliminates it. If I want to definitely get out of that building, all I got to do is go on suicide watch. But to go on suicide watch, you have to say that you feel suicidal. So yeah, I could see myself saying that ultimately, to leave that building, if that's the only way I can leave, yeah.

(Jackson Dep. 138:13-24).

It would be one thing if Plaintiff unambiguously denied Defendants' contention that Plaintiff acknowledged staging his requests for therapy and his attempted suicide episode on January 17. In that circumstance, Plaintiff's disavowal of the comments Defendants identify would likely create an issue of material fact. This case presents something quite different. Plaintiff has no corroboration for his self-serving testimony, while large sections of that testimony confirm or strongly support the contrary account of the facts adduced by his adversaries. It is not easy to say here, as often is the case at the summary judgment stage, that conflicting accounts leave issues open for trial. Plaintiff contends that the denial of psychiatric treatment on the night of January 17 was a deprivation of medical care so serious it drove him to

attempt suicide.  Yet Defendants' medical judgment, their account of his behavior and admissions in the immediate aftermath of the attempted suicide episode, the opinion of their medical expert, and even portions of Plaintiff's own deposition testimony indicate that Plaintiff deliberately staged his episode in an effort to obtain preferential housing.  If that were the case then it simply cannot be true that the delay in obtaining psychiatric treatment on the night in question was a sufficiently serious deprivation to implicate the Eighth Amendment.  Yet were Plaintiff's account disbelieved, he would have no evidence at all with which to resist Defendants' motion.

Normally, "'[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.'" *Jeffreys*, 426 F.3d at 553-54 (quoting *Rule* v. *Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)).  But "in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff' ... without making some assessment of the plaintiff's account," *id.* at 554 (quoting *Anderson*, 477 U.S. at 252).  Determining whether the delay in Plaintiff's receipt of mental health services was sufficiently serious for these purposes would require the Court to do just that here.

As the Second Circuit has explained, "in certain cases a party's inconsistent and contradictory statements transcend credibility concerns and go to the heart of whether [he] has raised *genuine* issues of material fact to be

44

decided by a jury." *Rojas* v. *Roman Catholic Diocese of Rochester*, 660 F.3d 98, 106 (2d Cir. 2011) (emphasis in original).  Were a valid Defendant properly named in this case and this issue properly before the Court, the Court would likely be forced to conclude that Plaintiff's testimony here is just such a case and that no genuine issue of material fact existed: the delay in treatment was not sufficiently serious.

As the now-dismissed unidentified Defendants and their interests were never properly represented in this matter, the Court need not and does not now rule on whether Plaintiff could conceivably have raised a triable constitutional claim against them.  For the reasons explained at length above, the answer is likely no.  However, the question before the Court on this motion is simply whether there is any dispute that must be resolved at trial about whether Defendants Bederman, Poggioli, or Eason violated Plaintiff's rights by being deliberately indifferent to his medical needs.  The Court has concluded above that there is no conceivable argument Plaintiff could have adduced from his account of the events in question that could demonstrate a constitutional violation — at least, as is relevant, against the parties actually named in this case.  Summary judgment must issue against Plaintiff.

**CONCLUSION**

For the reasons set forth above, Plaintiff's claims against the unidentified Defendants are DISMISSED without prejudice and Defendants' motion for summary judgment is GRANTED.  The Clerk of Court is respectfully directed to terminate the motions pending at docket entries 58 and 72 and to close the case.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith; therefore, *in forma pauperis* status is denied for purposes of an appeal.  *See Coppedge* v. *United States*, 369 U.S. 438, 444-45.

SO ORDERED.

Dated: June 20, 2014
       New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

*A copy of this Order was mailed by Chambers to:*

Richard Jackson
DIN# 09-A-1672
1200 Halsey Street
Apt. #2
Brooklyn, NY 11207